I understand that you were appointed under the Criminal Justice Act to represent Mr. Johnson and the court appreciates your willingness to accept the appointment. Thank you, Your Honor. May it please the court, counsel. Good morning, Your Honors. My name is R.J. Zaid along with my colleague, Michael Brey. I was appointed by the court to represent Ronald Johnson with respect to one specific appeal. The appeal that I'm representing him deals with his trial, his conviction, and his sentencing. After he was sentenced, there's a whole series of forfeiture proceedings that continued on and Mr. Johnson has appealed those. There should be at least two other matters that he appealed with respect to those. I specifically told Mr. Johnson I could not represent him and the Eighth Circuit allowed me to withdraw from those appeals immediately when that happened. So I'm here strictly to address the conviction. All right, we'll hear your argument on that and I believe we have briefs on the other matters. That's correct, Your Honor. Thank you. Your Honor, the first issue I want to raise is the excessive fines issue. I think the excessive fines issue here, what happened was at the district court after he was found guilty on all 10 counts, the amount that was taken and was roughly $2.1 million. The court then entered an order of restitution of $2.3 million and then it entered an order of forfeiture and the order of forfeiture is highlighted in the indictment, Your Honor. It's basically everything that's charged in the indictment was part of the forfeiture and that, if I may for a second, the order of forfeiture began with a personal money judgment of $2.1 million. It then continued with respect to a 17-acre island. It then continued to 1, 2, 3, 4, 5, 6, 7 cars and then it continued to another property and then it continued to numerous bank accounts and checks. It was roughly $41,000 checked or various accounts that had a few hundred dollars and a few thousand dollars in it in addition to that. The argument that we have is that under the Supreme Court's ruling in Baja Cajun, I hope I pronounced it properly, and also recently in Timbs v. Indiana, an excessive fine is, you know, the fine has to be grossly proportional to the conduct of offense and yet allow somebody to continue with a livelihood. Continue with what? A person's livelihood. If you go back to the Supreme Court cases that talk about ordered liberty and that this is fundamental and excessive fines are a very fundamental thing and, in fact, in Baja Cajun at page 335, the court talks about going back to the Magna Carta, the English Bill of Rights, and it says that forfeitures are the penalty are okay so long as in Magna Carta language you save to a free man, I'll say free person, you save for them their continent. Free people had, they had to have property they have standing back in old English time and and those property was next to their homes. So the court back then would say, look, you could have a fine but the fine cannot take away the ability to continue livelihood. The Magna Carta continues and talks about merchant and merchandise. You can fine them, you could do forfeitures, but you can't take away his merchandise. Then it says, with respect to all others, villains, as it's called in there, it says with those people you don't take away their wainage. Wainage is an old, wainage is nothing more than farm tools and implements and my argument is that the 2.1 million dollar fine after a 126 month sentence, after 2.3 million in restitution, and after the taking of all the personal property and real property that he had is grossly disproportionate to the crime that he has. So the forfeiture, the property and the automobiles, does that not offset the fine? I know it doesn't go toward the restitution, but does that go toward the fine? Not under the law, Your Honor. So what you're saying is there are three financial obligations. You're saying that there's the restitution to the victims, there's a 2.1 million dollar personal judgment, and then separate from all of that there's just a straight out forfeiture of the property. That's correct. The forfeiture of the property, when you do the forfeiture, it goes to the Attorney General and then the Attorney General has complete plenary control of it, whether to grant petitions for remission or to use it to offset the restitution or to use the matter for the Fisc of the United States. So will it go toward the restitution then? You said it might. I don't believe so. There's nothing to indicate that it does, Your Honor. What's the total value of the forfeited property? We believe, Your Honor, at least that the total value of the forfeited property, we know that the government sold the island for roughly $160,000, $70,000. The government indicated that all the cars that they took during trial was worth another $290,000. So I'd say the total taken by the government is roughly half a million, somewhere in there. But I do not have, unfortunately, the record is not clear enough. Why wouldn't that offset the 2.1 money judgment? Well, that goes to the Attorney General too, doesn't it? Whatever he pays on that. It goes to the forfeiture fund, doesn't it? Yes, Your Honor. Doesn't it? I don't know for sure. I assume it does. That's a good question. Since it was imposed as a forfeiture. But, okay, the forfeiture, let's assume there's, so that still leaves $1.5 million. We'll ask the government about that. But what about the fact that the amount, though, was based on how much the court found that he was personally enriched by the crime? Shouldn't that make it, by definition, doesn't that make it proportional? But the problem, Your Honor, with that is that there's a $2.3 million restitution, which means, okay, you got to come up with $2.3 million and pay back, make whole the victims of the crime. So that's already there. So then what's left for that person? It's like, okay, you were enriched. We took away your island. We took away your cars. We took away your skid steer machine. We took away various accounts from you. We took all that away from you. And on top of that, we're going to impose a $2.1 million judgment. This guy is sort of a double counting type argument. That's correct, Your Honor. Mr. Johnson's in his 50s. He's going to serve, and when the court looks at excessive fines, you need to look at the sentence as well. It's all part of the penalty that he's facing. He's going to be in prison for 126 months. And on top of that, when he comes out, he has to pay $2.3 million in restitution. All the assets that he had have been forfeited. And on top of that, he has a $2.1 million judgment on it. So in your view, what would be a constitutional fine in this situation? I think the constitutional fine in this situation would be since, by him having a restitution order of $2.3 million and all the forfeiture that was taken, I believe that would be a constitutional fine. So zero fine? Yes. So what would be a... Is there anything over zero in this factual scenario that you've set up, given his age, given the number of years in prison, and given the restitution owing? Is there any dollar amount that would be constitutional? Well, Your Honor, I think that's hard to answer because the case law is unclear. It says that the fine has to be tied in some way to the offense. So if you already ordered $2.3 million in restitution, and you took away all the profits that he made out of it, then if you structured a fine, something... Let me back up. A lot of cases there's no fine imposed because the defendants are indigent and have no ability to pay, even though the fine ranges from zero to two million or whatever, like in drug cases, things of that nature. That, I think, would go to the discretion of the court in terms of, okay, when you come out, how old are you going to be? What are the chances of success on this? I don't know the answer to that, Your Honor. I really don't. Because it sounds like, given what you're saying, is that realistically, would he be able to pay the 10 years down the line, when someone's into their 60s, to be able to pay back $2.3 million seems unrealistic. Is that what you're saying? That is what I'm saying, Your Honor. So what I'm hearing is that there's just no other... To be constitutional, there's just nothing else that the court could add on. I'm not sure. Maybe that's something that we, if the court remains, that we could have a hearing on that point, to livelihood ability. He's a construction worker, things of that nature. I guess my point is, any kind of hearing was unlikely to show that he could pay back anything more than $2.3 million, if I'm understanding your argument. My argument is basically, yes, Your Honor, that he doesn't have anything more to give. You can't squeeze blood out of a turnip. And that's where we are. Well, we have cases that say even when a person is indigent, it's not impermissible to impose monetary sanctions. Maybe they won't be the person does come into money, then they're collectible. I appreciate that, Your Honor. But when you're imposing at least twice what was relatively taken and you're sending somebody away for over 10 years, that's an issue. What about these cases, the government sites that say that both forfeiture and restitution are mandatory and that they don't offset each other? Well, that's my argument is that as applied here, I'm making a challenge. It's unconstitutional as applied in this case. The combination of various statutes as applied to Mr. Johnson have violated the Eighth Amendment. So I'm making it as an as applied argument to that. Very quickly on venue, Your Honor, the burdens on the government, they have the proof by the preponderance. And specifically, the only evidence they offered is that Mr. Johnson's from Minnesota. Therefore, the event either started in Minnesota or was received in Minnesota. With respect to Count 1, the victim was from South Dakota. The evidence in the record shows that at that time, Mr. Johnson was traveling between North Dakota, South Dakota, and Montana. And with respect to Count 1, other than that Mr. Johnson lives in Minnesota, the government offered zero with respect to venue that happened here. There's somebody testified at trial about the server, the email server. That was outside Minnesota, so it didn't go there. It had to be sent from Minnesota or received from Minnesota. The victim in Count 1 is in South Dakota. The only thing, oh, well, Ron Johnson's in Minnesota. It's Valentine's Day, so he had to be home. But there's no bank records to support that theory. It was the burdens on the government. The government argues waiver, but there's no waiver. We made a Rule 29 motion. There's absolutely no burden, zero, on a defendant to present any evidence, to present any jury instructions, or to make any arguments to the jury. It's a matter of law. It's a burden. It's on the government to prove. There was no jury instruction on this? That's correct. So we're just looking at whether, if it had been instructed, any reasonable jury could have found by a preponderance, is it a preponderance standard on the venue issue? Yes, that's correct, Your Honor. Whether any reasonable jury could have found by a preponderance of the evidence that the venue was satisfied? That's correct, Your Honor. What about the fact that Johnson is a Minnesotan? I mean, I understand he also traveled some, but isn't the fact that his home is in Minnesota worth something? It's worth something, but I don't think he gets you to the preponderance, Your Honor. Because he was traveling. On any given day, isn't it more likely than not that a person is at his home, unless there's some contrary evidence? Well, if you're a traveling businessman, I would say not necessarily. I think if the burden means something, the government has to show more than that this person's in Minnesota. Otherwise, you've basically eviscerated the venue requirement. If the venue can be satisfied strictly because a defendant is from a state, then it doesn't matter about the transactions, does it? Well, I understand your point. It can't be just that he's from the state, but the fact that he's from the state may support an inference that he was in the state. That's correct, Your Honor. I don't disagree with that. Yeah, I think that may be what it comes down to, do you think, here? Whether that's enough to, I guess, together with the documents they have, which I understand aren't precise on this date. Right. They do not have any documents showing that on this date, February 14th. They have surrounding dates, is that right? They have surrounding dates, yes, Your Honor. Would you like to save any time for rebuttal, or do you want to proceed? I have 30 seconds on the search warrant. He's in a farm. He's isolated. They wait till his family, he leaves his house, goes 30 miles away. When he pulls in there, they pull him behind them. They constrain him. As they're walking up to the barn, they see the cell phone in the truck. They see a computer in the truck, and they say, okay, we need to get that. He wants to talk to his wife. He calls his wife, and he says, learns from his wife that they broke in the door, isolated his family and children. He says, I want to go home. I got to go to my family. I got to go to my family. No, you can't go. I need to call him. No, you can't use your phone. I need to go. You can't use your truck, because we're going to search. If you consent to the truck, it'll take 20 minutes. You can go home. That was coerced, Your Honor. Very well. Thank you for your argument. Mr. Kokanen, we'll hear from you. Good morning, Your Honors. May it please the Court. My name is John Kokanen, and I represent the United States. I had intended to limit my remarks to the issues of venue and the voluntariness of the consent to the search of the truck, but it sounds like there are some points that I can clear up with regard to the excessive fines argument. First of all, at least the Fourth and the Ninth Circuit have both held that the imposition of both a restitution amount and a forfeiture amount doesn't violate the excessive fines clause. In fact, as best as I can tell, in a proceeds-based forfeiture, and what I mean by that is where the defendant is required to disgorge the proceeds of a fraud, you have a perfect match between the money taken from the victims and the money that's ordered forfeited. The context where a forfeiture amount has been found to be excessive is when the property was involved in the commission of an offense. For example, a motel was used to run some sort of a drug operation or a drug business, and that motel was then forfeited by the government because it was used in the commission of the offense, even though the owners of the motel weren't particularly involved in the drug offense. And so in that regard, you have the taking of property involved in the commission of the offense that might dwarf or be grossly disproportionate to the actual crime that was committed. Here, there's a perfect match. Mr. Johnson realized $2.1 million in proceeds from his fraud, and he was required to disgorge through forfeiture that same amount. But he was also required to pay it to the victims. Correct. And that's where the Fourth Circuit and the Ninth Circuit cases say that the fact that both are ordered doesn't render the fine, I'm sorry, the forfeiture or the restitution an brief. I don't see the Fourth and the Ninth cited for that proposition. Sure. And I think we did cite in our brief the Blackman case, which is... Yeah, well, Blackman is not about the excessive fines clauses. I understand it. Blackman says eight other circuits have rejected forfeiture, restitution, double recovery, due process type challenges. I am aware of a couple of cases that I don't... I want to make sure whether you're stating the law correctly in these other cases or whether this is a question of first impression. If I may, Your Honor, I do think there are two additional cases that weren't cited in our brief. One is... Well, why don't you send us a letter on those then? Okay, I will, Your Honor. You want to give us the names of them? Sure. United States versus Newman. Newman. Newman, 659 F3rd 1235. What court is that from? The Ninth Circuit. And United States versus Fujinaga. I'm sorry, that was wrong. Maybe I have the Ninth Circuit. I'm sorry, just the Ninth Circuit. The Newman case is all I have at my fingertips right now, where the court held that forcing a defendant to pay both forfeiture and restitution at worst forces him to disgorge twice the value of the proceeds of his crime, which is in no way disproportionate to the harm inflicted upon government and society, which are two different interests. That there's an interest in forcing someone to disgorge the proceeds of the crime. That's a societal interest. And there's an interest in forcing someone to provide a hypothetical that illustrates this fairly well is, for example, someone steals a million dollars and then takes that to the casino and doubles up and realizes $2 million. It would be nothing excessive or unconstitutional or disproportionate about forcing the person to disgorge the $1 million in fraud proceeds through a forfeiture and to also use the $1 million gain from the casino to satisfy the restitution obligation. Mr. Zayed suggested that... Well, he says that it's irrelevant here because this man didn't do that and he's indigent and he's going to be in prison for 10 years. So how does your hypothetical help? Well, I'm not... Well, I am not aware of any test that requires the court to consider the likelihood that a defendant will be able to repay restitution or forfeiture in deciding whether to impose forfeiture or restitution. That does apply in a fine context. The court can take into account the likelihood of a defendant being able to pay a fine. But in the context of forfeiture and restitution, as Your Honor noted, those are mandatory. And I'm not aware of anything in the law that says that the court is permitted to disregard those mandatory aspects in light of the indigency of the defendant. And there's good policy reasons too, I would argue, Your Honor, that if someone realized... And these aren't just hypotheticals, this is real world examples where an individual is ordered to pay both forfeiture and restitution. They later come into money through maybe an inheritance or something like that. And the government, where it was previously maybe would have just used forfeiture proceeds to satisfy the restitution obligation, will go after that additional money so that both the victims can be made whole and society can be made whole from the forfeiture perspective. The last... When you say society can be made whole, what do you mean by that? How has society been, other than the members of the society who lost the money, who will be compensated through restitution, how did society lose 2.3 million dollars? Well, I think the sentence as a whole, all the various aspects of the punitive portions of the fines and any forfeiture serve the societal interests of making sure that there's just punishment doled out for crimes, irrespective of whether the victims are made whole or not. The last point that I'd like to make to clarify with regard to Mr. Zayed's comments is that it's not... I think Your Honor identified this, that he would realize an offset for the direct property. I mean, you have two different kinds of forfeiture. You've got forfeiture of direct property and then forfeiture of substitute assets. That's what the personal money judgment is, is the forfeiture of substitute assets. To the extent that the direct property, the roughly $300,000 for the real estate and the cars, doesn't discharge the full 2.1 million, that's where the personal money judgment kicks in. So the most that the government could collect on that personal money judgment, it sounds like, would be about $1.8 million. So it's not as if he's going to be double paying on the forfeiture. Turning to the issue... How do we verify that? Is that in the record or is there a statute that says that? Or how do we verify that this forfeited property will reduce the money judgment? I'm not aware of it in the record because this is something that happens well after sentencing, when the government finally is able to sell the assets and then settle up. But it's my understanding, speaking with my colleague Mr. Bownie, who is one of our forfeiture experts, that that's the process by which it works. The way these various laws interact. I think it may be articulated in the forfeiture order as well, but also in the various statutes that would have been direct proceeds and the forfeiture of substitute assets. So you think we should just figure it out by looking at the different statutes? Yeah. Okay. I'm not suggesting that, Your Honor. This issue wasn't something that I anticipated coming up, there being an actual debate. Well, if there's a simple answer to it, maybe you could send us a one or two-page letter explaining it and then Mr. Zaid could respond if he thinks it's wrong. Sure, Your Honor. Thank you. Turning to the question of venue, Your Honor, as the parties noted in the brief, this court has not weighed in on a circuit split regarding the test for venue. There's the Seventh Circuit in the United States v. Pearson and then the Fourth Circuit, I believe, in the United States v. Pace. The government's view is that the Pearson case is the better standard. Under that standard, as long as there was conduct in the district devising and implementing the scheme, that's sufficient for venue, whether or not wires were sent from that district. And under that test, Mr. Johnson's appeal fails. There's no dispute that Mr. Johnson devised and implemented the scheme in Minnesota. He met with some of his victims in Minnesota and made misrepresentations to them about the project and the status of the project. He implemented the scheme in Minnesota by depositing investor funds into bank accounts in Minnesota and then spending those investor funds for personal purposes, purposes that were inconsistent with what he had promised his victims. All of those spending was in Minnesota. Even under the other test, the court doesn't even need to weigh in on this circuit split because under the other test, the evidence was sufficient to show that that venue was proper in Minnesota. As Your Honor noted, there's testimony that Mr. Johnson both lived and worked in Minnesota. And I would argue that that by itself is enough to support the inference that on any given day, absent any indications to the contrary, it's more likely than not that the person is in Minnesota. I think it's important to note, too, that the strength of that inference is reinforced by the fact that Corcoran and Maple Lake, Corcoran is where the home was, Maple Lake was where the cattle ranch was, those are in the metropolitan area. So it's not as if they are near a border such that the inference would be weakened to think that perhaps Mr. Johnson occasionally crossed over into a different state. In addition, we also have bank records that show that the vast majority of Mr. Johnson's time was spent in Minnesota. You can see him making purchases at retailers, Menards, gas stations, things of that nature, all not surprisingly in the communities in and around Corcoran and Maple Lake. How long would it have taken? How long is this drive to South Dakota? So I did look that up and I think the court could probably take judicial notice of it. It's about an hour to Wisconsin, about two hours to Iowa, and about three hours to South Dakota. And this wasn't part of the testimony? This wasn't part of the record in the trial? There was about 30 minutes from the metropolitan area and I think perhaps jurors, using their common sense, could have a guess about how far that is to South Dakota, Iowa, and Wisconsin, but I don't think there was any specific testimony about how long of a drive it would be from Corcoran, say for example, to South Dakota. The bank records also showed Mr. Johnson spending money here in Minnesota and around the times that these emails occurred that were the wire fraud counts. In fact, on a lot of them, there was spending clearly in Minnesota on the same day that Mr. Johnson sent the emails and in two of the other instances, there was spending in Minnesota within a day or two of Mr. Johnson having sent an email. Now, Mr. Johnson's arguments on appeal are really just the mere fact that Mr. Johnson lives and works in Minnesota, that by itself is enough to make it more likely than not that on any given random day that he was in Minnesota. And all of Mr. Johnson's arguments are really just alternative inferences that could be drawn from the evidence, or maybe to be more precise, they're just claimed weaknesses in the strength of the inference urged by the government. For example, Mr. Johnson claims that he occasionally traveled outside of Minnesota or that it's possible that his wife maybe used the credit card, or I'm sorry, the debit card, which tend to place Mr. Johnson in Minnesota. Essentially, what that argument is, is that the government couldn't eliminate the possibility that he could have been somewhere else. And I think I can safely concede that it is possible, but the question is whether it's more likely than not. And given the evidence that was presented, it is more likely than not that he was the one using those bank accounts. He was the sole signatory. And that given that they were occurring in Minnesota in a timeframe, in close proximity to when the emails were sent, that he was in Minnesota when he sent those emails. Do you agree that it wasn't, the defendant wasn't obligated to submit a jury instruction on this in order to preserve the issue for appeal? It appears that, that's a little bit unclear, but it appears that the case law that Mr. Zayed cited does seem to indicate that merely arguing it to the district court, even if you don't press that argument to the jury, is enough to preserve the question of whether or not there was sufficient evidence to submit the matter to the jury. I would note that this idea of ruling out the possibility that he could have been somewhere else isn't required. That's not even required under a proof beyond a reasonable doubt standard where the government's not required to eliminate contrary inferences to the one that's offered by the government. But just to be sure, the government did rule that possibility out. There was evidence presented showing that when Mr. Johnson did leave Minnesota, there was an obvious, common sense, predictable pattern of him spending money in states outside of Minnesota. And during the proximity of the emails that formed the basis of the counts, there wasn't any that type of a pattern showing him to be outside of Minnesota. With the very little time I've got left, I'll turn to voluntariness of the search. The narrative constructed by Mr. Johnson is just incorrect. He was never denied the opportunity to go to the truck. He was never denied the opportunity to leave in the truck because he never asked that. There were hypothetical questions posed to the agent at the suppression hearing about, had he asked to leave, would he have been prevented? And the agent said yes, but he was never actually asked to leave. Nor was there any evidence that Mr. Johnson knew about the aggressive tactics used at his home. There were aggressive tactics used at his home, but there's no evidence that he actually knew about it. And sorry, I see that I'm out of time. So I will ask the court to affirm the lower court's decisions. Thank you. Very well. Thank you for your argument. Mr. Zaid, we'll hear from you in rebuttal. Thank you, Your Honor. With respect to considering the livelihood, I would direct the court to Bajaj Kejian at page 335, 336 and footnote 15. Footnote 15 says in that case, the individual did not raise livelihood or his inability to pay as an issue. But clearly when you couple that footnote with what's said in 335 and 336, livelihood is an important component. You can't leave somebody destitute that they can't earn a livelihood. That's excessive. And with respect to the count one venue, again, there's no record at all showing that on February 14th, Mr. Johnson was in Minnesota on that other than the fact that he is a resident of Minnesota. Does the court have, does the court set a payment schedule in this case of any kind? I mean, doesn't the court have some discretion to set a payment schedule that allows the person to be other than homeless and destitute? Okay. It says in the court's sentencing on page seven, it talks about after you are released from prison, you must begin making payments toward any remaining restitution obligation within 30 days of your release and says you must make monthly payments of at least $100. If probation officer determines that you're able to pay more than $100 per month, then you must make restitution payments in the amount directed by the probation officer. That's what it talks restitution. Okay. So $100 a month for restitution, but then there's a personal judgment that's still out there. Is there any payment schedule on that? Not that I see that. All it says is the property identified in the first and second preliminary order for forfeiture and a personal money judgment of forfeiture in the amount of $2,100,000 based on defendant's conviction that he shall forfeit all those interests to the United States, but it doesn't say when. My understanding on it is once a judgment is entered, which this is already there, he has an obligation to pay, which then allows the government to be a judgment creditor and they could start asserting liens and garnishments and things of that nature. And there's absolutely nothing preventing that from happening here. Are there any exemptions for a home? Unfortunately, I'm not a forfeiture expert on that and I'll see what the government submits and I'll have the opportunity to respond to that, Your Honor. Very well. Thank you very much. Thank you for your argument, Mr. Zaid. Case is submitted in the